**N. Lee LIGO and Richard P. Lednak, Appellants**

v.

**SLIPPERY ROCK TOWNSHIP and Robert Hesselgesser and Paul Dickey, in their capacity as Slippery Rock Township Supervisors and Paul E. Kiebler, IV.**

Commonwealth Court of Pennsylvania.

Argued Oct. 10, 2007.

Decided Nov. 29, 2007.

Bruno A. Muscatello, Butler, for appellant, N. Lee Ligo.

David E. Henderson, New Castle, for appellees, Slippery Rock Township, Robert Hesselgesser and Paul Dickey.

Michael K. Parrish, Pittsburgh, for appellee, Paul E. Kiebler, IV.

BEFORE: FRIEDMAN, Judge, and COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Appellants N. Lee Ligo and Richard P. Lednak (Appellants) appeal from an order of the Court of Common Pleas of Butler County (trial court) affirming the decision of the Slippery Rock Township Board of Supervisors (Supervisors) that granted the Application (Application) submitted by Paul E. Kiebler, IV (Developer) for a Planned Residential Development (PRD). The following facts give rise to this appeal.

On February 23, 2006 Developer submitted to Supervisors an Application to implement a PRD known as the Slippery Rock Quadrangle (Quadrangle) on a 42.76 acre tract of land (Property) that abuts Slippery Rock University (SRU).[1] The Quadrangle would consist of "19 residen-

---

**1.** There was an issue of whether portions of the property were zoned A–1 or R–2. In a prior rezoning case, Developer sought to have one of the parcels that would make up the PRD rezoned from Agricultural (A–1, also referred throughout the record as AC–1) to Residential (R–2). The Supervisors granted the request, but the trial court reversed, concluding that there was a procedural flaw in the application process. The case (Rezoning Case) was appealed and, in a memorandum opinion issued in April, we affirmed. Allocatur was filed with the Supreme Court.

Before we issued *our* decision in the Rezoning Case, Developer filed with the Supervisors, for tentative approval, the PRD Plan at issue in this case. The Supervisors treated the rezoning as having been effective, and looked at the property as being R–2. *However,* the Supervisors also noted that a PRD was allowed as a conditional use in *both* R–2 and A–1 districts, and that the requirements for granting a conditional use would be satisfied even if the parcel was zoned A–1. On appeal, the trial court also treated the rezoning as being effective when it affirmed the granting of tentative approval of the PRD. The appeal of this decision is what is at issue in the present case.

tial buildings, a clubhouse, and a small maintenance building," (Narrative Statement, R.R. at 32a), containing 244 dwelling units and would be used to house SRU students. The Quadrangle would have "outdoor common areas for active and passive recreational amusement." (Narrative Statement, R.R. at 32a.) The buildings, themselves, were arranged in a way to highlight features of the SRU campus from the Quadrangle, and the materials to be used on the outside of the buildings were designed to blend in with the surrounding area:

> The architectural design is influenced by the historic buildings of [SRU], specifically Old Main and its clock tower. The residential buildings in the center of the development will be three stories tall and constructed of brick in the Georgian-style. They will be arranged around a large, central quadrangle, reminiscent of the Old Main quadrangle. [SRU] and the Old Main clock tower will be directly on axis with the new quadrangle. The landscape plan will feature a double row of Sycamore trees along each side of the quadrangle to emphasize the view back to the campus. Closer to Kiester Road, the buildings will change in character, becoming more residential, and will be finished with clapboard siding similar to the residences and farms adjacent to the development. Around the periphery will be a heavily landscaped buffer. In addition, no buildings along Kiester Road will be more than two stories high.

(Narrative Statement, R.R. at 31a–32a.) Similarly, the Quadrangle calls for landscaping and open space to blend the Quadrangle in with the surrounding community:

> To the east of the residences, there will be a 10.5–acre area preserved as open green space.... The location of this area was chosen to provide an additional buffer to the residential and agricultural areas adjoining the property. The retention pond, which will be designed as an amenity, will be integrated into the landscape in an environmentally-sensitive manner.

(Narrative Statement, R.R. at 32a.)

In addition to the Application, Developer submitted a request for a modification from the density requirements of the Zoning Ordinance of the Township of Slippery Rock (Ordinance). Section 309K(6) of the Ordinance provides, in relevant part, that "[b]uildings containing multifamily units shall have no more than four (4) units/dwellings." (Ordinance § 309(K)(6), Original Record at 31.)

The Supervisors granted the request for modification from the density requirements and also approved the tentative PRD for the Quadrangle. The Supervisors addressed the density of the units within the PRD by acknowledging that, while the PRD departs from the four (4) dwelling units per building limitation of Section 309(K)(6) of the Ordinance, the proposal was "less dense than the ordinance would otherwise allow" because the 42.76 acre site "could be divided into multiple lots, each of which could be developed with apartment buildings, ultimately resulting in a greater number of dwelling units." (Supervisor's Decision (Decision) Finding of Fact (FOF) ¶ 20.) The Supervisors also noted that the PRD, by clustering the buildings close together rather

---

While the present case was before this Court on appeal, the Pennsylvania Supreme Court denied allocatur to the Rezoning Case. Accordingly, the rezoning remains ineffective, and the parcel continues to be A–1. Appellants in the present case asked to have the case argued, based on this development, and we granted that request. These arguments will be addressed later in the opinion.

than spreading them out throughout the Property, creates a greater buffer for adjoining properties, (Decision FOF ¶ 20), and creates 37% more open space than the Ordinance would require.[2] (Decision FOF ¶ 21.) The Supervisors also attached eighteen (18) conditions to their approval and required an Application for final approval within fifteen (15) months of the Decision.

In addition, the Supervisors expressed several reasons why the Quadrangle was consistent with the Township Comprehensive Plan. In particular, the Supervisors noted that the Quadrangle would address a concern, expressed in the Comprehensive Plan, about the need for additional student housing because of the expansion of SRU and its increasing enrollment. The Supervisors found that: "this denser student housing plan will help address the demand for student housing and accomplish the Township's goal of discouraging the conversion of single family homes into multi-family student units, and to prevent further erosion of quality in rental housing." (Decision FOF ¶ 19(b).) The Supervisors also noted that the Quadrangle was consistent with the Comprehensive Plan because "[t]he Comprehensive Plan encourages fu-

ture development and expressly provides that high density developments within the Township should expand outward from the Borough as the hub. The site in question abuts [SRU] and is in close proximity to the Borough." (Decision FOF ¶ 19(a).) The Supervisors also thought that the Quadrangle was consistent with the Comprehensive Plan because "it is in keeping with the Township's stated desires to permit planned residential developments to 'encourage the flexibility in the design and development of land in order to promote its most appropriate use.' "[3] (Decision FOF ¶ 19(a).)

Appellants appealed the Decision to the trial court, raising fifteen bases for objection. The trial court, without taking additional evidence, issued an opinion, which rejected each of Appellants' objections and affirmed the tentative approval of the PRD. Appellants appealed the trial court's decision to this Court and submitted a concise statement of matters complained of on appeal.[4] The trial court issued an opinion pursuant to Pa. R.A.P.1925(a) in which it rejected each of these arguments and recommended that this Court dismiss Appellants' appeal.

2. The PRD provides for 29.42 acres of open space while the Ordinance would only require 21.38 acres of open space.

3. The Supervisors also found that the Quadrangle helped to meet one of the Comprehensive Plan's goals of extending sewage service along Kiester Road, which is adjacent to the Quadrangle, and the Supervisors looked favorably on the fact that this goal would be accomplished "at the expense of the developer rather than at the expense of taxpayers." (Decision FOF ¶ 19(c).) The Supervisors acknowledged that the Comprehensive Plan calls for the protection of farmland and that the Quadrangle plan does not really do anything to address farmland protection. The Supervisors, however, reasoned that this alone did not provide a sufficient basis for denial of the PRD, in particular because the

Property at present was not used for agricultural purposes, but was being used as a driving range. (Decision Conclusion of Law (COL) ¶¶ 4–5.)

4. We have combined similar arguments raised by Appellants into the three arguments described here: (1) did the Supervisors err in finding that the PRD satisfied the requirement of the Ordinance's PRD requirements; (2) did the Supervisors err in not requiring Developer to apply for modifications for not having single-family dwellings along the periphery and not having the density of the development decrease from the interior to the exterior of the PRD; and (3) did the Supervisors err as a matter of law by approving a PRD that has only a multiple-family dwelling development, which the PRD authorizes as only a permitted *additional* use, and not as a sole primary use.

Before this Court, Appellants argue that PRDs are conditional uses that must satisfy each of the requirements in the PRD sections of the Ordinance. Appellants contend that several of those PRD requirements were not met: (1) the Quadrangle calls for an insufficient peripheral buffer zone and minimum frontage; (2) the Quadrangle violates the Ordinance by failing to include single family housing; (3) the Quadrangle calls for development that is denser than is allowed by the Ordinance; and (4) the Quadrangle fails to satisfy the Ordinance's PRD requirement that the density of residential units shall generally decrease from the interior to the exterior. Developer challenges Appellants' arguments. We first provide some background on PRDs before addressing each of these arguments in order.[5]

A PRD is "a larger, integrated planned residential development which does not meet standards of the usual zoning districts." *Kang v. Supervisors of Township of Spring,* 776 A.2d 324, 328 (Pa.Cmwlth. 2001) (quoting 2 Robert S. Ryan, Pennsylvania Zoning Law and Practice (Ryan), § 12.1.1 (2001 ed. and 2004 supp.)). "The idea behind PRD zoning is to create a method of approving large developments which overrides traditional zoning controls and permits the introduction of flexibility into the design of larger developments." *Kang,* 776 A.2d at 326 (quoting Ryan § 12.1.8). It "offers municipalities flexibility," *Kang,* 776 A.2d at 328, by replacing the underlying zoning provisions once the record of the development plan is filed. Section 711 of the Pennsylvania Municipalities Planning Code (MPC),[6] 53 P.S. § 10711(d); *Alta Vita Condo. Ass'n v. Zoning Hearing Board of the Township of*

*Hempfield,* 736 A.2d 724, 728 (Pa.Cmwlth. 1999). Section 107 of the MPC defines PRD as:

> an area of land, controlled by a landowner, to be developed as a single entity for a number of dwelling units, or combination of residential and nonresidential uses, the development plan for which does not correspond in lot size, bulk, type of dwelling, or use, density, or intensity, lot coverage and required open space to the regulations established in any one district created, from time to time, under the provisions of a municipal zoning ordinance.

53 P.S. § 10107.

The Township of Slippery Rock (Township) relied on these principles in adding its own PRD section to its Ordinance. The preamble portion of Section 309 of the Ordinance provides that:

> The purpose of the planned residential development regulations is to encourage the flexibility in the design and development of land in order to promote its most appropriate use; to encourage grouping of housing and a mixture of housing types in alternative patterns and in a variety of ways; to facilitate the adequate and economical provision of streets and utilities; to conserve valuable agricultural land to promote farming in the Township; and to preserve the natural and scenic qualities of open areas.

(Ordinance § 309.) PRDs are allowed as conditional uses in several different districts, including A-1 and R-2 districts. The Ordinance sets forth eight different "Development Objectives" for PRDs:

---

5. This Court's review is limited to determining whether the governing body committed an error of law or an abuse of discretion. *Kang v. Supervisors of Township of Spring,* 776 A.2d 324, 327 n. 7 (Pa.Cmwlth.2001).

6. Act of July 31, 1968, P.L. 805, *as amended.*

(1) Extend greater opportunities for traditional community living, working, housing and recreation to all citizens and residents of the Township.

(2) Encourage a more efficient use of land and public services and to reflect changes in technology of land development and by directing new development in a traditional pattern of mixed and multiple-use and varied housing types.

(3) Provide a procedure which can relate the type, design and layout of residential development to the particular site, the particular demand for housing existing at the time of development and to the Township's goal of encouraging residential/mixed use development in a manner consistent with the preservation or enhancement of property values within existing zoning districts.

(4) Insure that the increased flexibility and design specificity of regulations over land development authorized herein is carried out under such administrative standards and procedures as shall encourage the disposition of proposals for land development without undue delay.

(5) Preserve the remaining rural, historic and natural character of the community by directing new development to appropriate locations and minimizing the visual impact of development upon the viewsheds from the public roadway.

(6) Promote the creation of developments that are identifiable in the landscape, surrounded by open space and help preserve sensitive natural features.

(7) Preserve the existing agricultural base of the Township by allowing irreplaceable farmland to be protected from permanent development to other uses.

(8) Allow future development to replicate the best from the Township's historic patterns of settlement.

(Ordinance § 309(A)(1)-(8).) The Ordinance also authorizes the Supervisors to, "by conditional use approval, permit the modification[s]" of the PRD part of the Ordinance and, in doing so, impose conditions "as will, in its judgment, secure the objectives and purposes of this Part." (Ordinance § 309(D).)

 The Ordinance provides that PRDs may be granted as conditional uses. A conditional use is a special exception, which falls within the jurisdiction of the municipal governing body rather than the zoning hearing board. *Collier Stone Co. v. Zoning Hearing Board for the Township of Collier*, 735 A.2d 768, 770 n. 1 (Pa. Cmwlth.1999). An applicant for conditional use has the burden to demonstrate compliance with the applicable requirements. *Levin v. Board of Supervisors of Benner Township*, 669 A.2d 1063, 1069 (Pa. Cmwlth.1995). As discussed above, PRDs, by their nature, have a far greater degree of flexibility in land development and planning, and the requirements for approving a PRD as a conditional use generally afford the municipal governing body greater latitude than more traditional conditional uses would necessarily allow. With this background, we turn to the arguments.

 First, Appellants assert that minimum frontage and buffer requirements, which they contend are determined by the number of units, are insufficient. Appellants argue that the Ordinance requires a buffer zone of three feet per unit around the entire PRD, which, given the Comprehensive Plan, would require a 732

foot buffer, and that the proposed buffer falls far short of this requirement.[7] Similarly, the Ordinance requires minimum frontage of 15 feet per unit, which would require a 3660 feet of frontage, and not the 1864.73 feet of frontage that the Quadrangle calls for. Appellants argue that the requirements are made mandatory by Table 307–2 and Section 309 of the Ordinance.

Developer argues that the Ordinance does not make the minimum frontage requirements applicable to PRDs. Developer argues that the Supervisors rejected an interpretation of the Ordinance that would impose the per foot setback requirement based on the number of units as being onerous and prohibitive of any development but, instead, interpreted the requirement as applying to each building. We agree with Developer.

The PRD provisions of the Ordinance are all contained in the subsections of Section 309 of the Ordinance. Section 309(I) of the Ordinance requires that, "[t]o minimize conflicts with neighboring uses, all setbacks as normally required by the zoning district in which the [PRD] is proposed shall be reserved as peripheral open space where the [PRD] borders other developments or uses." (Ordinance § 309(I).) Based on this language from Subsection I of Section 309, Appellants rely on Table 307.2 of the Ordinance, which sets forth the setbacks normally required. Table 307.2 sets forth the following "YARD AND HEIGHT REQUIREMENTS" for a "multifamily lot" that is connected to a public sewer and that has "50+ Units":

| Minimum Lot Area | Minimum Width | Minimum Front Yard | Minimum Side Yard | Minimum Rear Yard | Maximum Height | Maximum Coverage |
|---|---|---|---|---|---|---|
| | | | * * * * | | | |
| 10 Units/Acre | 15'/Unit | 20' | 3'/Unit | 1' Unit | 45' | 30% |

(Ordinance Table 307.2.) Although Appellants rely on this table for both their frontage and buffer arguments, it does not seem to support their position, in particular, as to the frontage requirement. First, while Section 309(I) references setbacks as

7. Appellants argue that Developer's own expert testified that the side buffers were only 3 feet to 5 feet. Appellants point to the transcript which reads:

> Q: Can you tell me the setbacks, identify the setbacks?
> A: Sure. The setbacks, on side setbacks, we are showing *three to five* foot setbacks. The front setbacks along Kiester Road are 50 [feet]. And then the rear setbacks are 70 [feet].

(Conditional Use Hearing Transcript, Mar. 27, 2006, at 12, R.R. at 62a (emphasis added).) Nothing else in the documents or testimony suggests that the side setbacks are 3 to 5 feet. Rather, the remainder of the evidence suggests that the side setbacks were *thirty-five* feet. Some of the diagrams seem to indicate a setback of closer to 15 to 20 feet, but even these diagrams do not suggest a setback as small as 3 to 5 feet. The "three to five" transcription seems to be a transcription error in which the transcriber misunderstood testimony of "thirty-five" to be "three to five". Nonetheless, if this is the case, we are puzzled by Developer's failure to point out this error in his brief before this Court. As Appellee in this case, he was well aware of the Appellants' arguments and their reliance to this testimony; yet, Appellee makes no reference to this testimony. The Supervisors, however, were present for the testimony, and the Supervisors found that the side setbacks were 35 feet. As there is some documentary evidence to support this, and no evidence to support a 3 to 5 foot setback, questionable transcription notwithstanding, we will treat this "three to five" feet as a scrivener's error.

being used to determine peripheral open space, it makes no mention of frontage. In the absence of clear language from the PRD section of the Ordinance indicating that the frontage requirements would apply, the frontage requirements are inapplicable. Additionally, nothing from this chart suggests that the minimum frontage was determined by calculating 15′ per unit. Rather, only minimum width is calculated by this measure. Second, Developer is correct that the PRD section of the Ordinance has its own specific provision for determining open space/setbacks/peripheral space:

(4) *Area and Bulk Regulations.* To meet the minimum peripheral open ~~spaces~~ *space* required, the following side, front and rear yard regulations shall apply to the entire planned residential development and those individual lots or buildings which abut the boundaries of the proposed planned small development. . . .

| Districts | Minimum Front Open Space | | Minimum Side Open Space | Minimum Rear Open Space |
|---|---|---|---|---|
| A-1 | 30′ | | 35′ | 70′ |
| | | * * * * | | |
| V-1/R-2 | 50′ | | 25′ | 50′ |

(Ordinance § 309(K)(4) (editing marks in the original).) There is no evidence that the PRD does not comply with these requirements. The Supervisors apparently relied on Section 309(K)(4) to conclude that the open space requirements were satisfied. The Supervisors found that:

[t]he proposed PRD has rear open space of 70 feet or more, side open space of 35 feet or more, and front open space of 50 feet or more. In addition, there is substantial additional open space between any proposed building and any existing single family residence, and landscaping will further buffer the proposed PRD from adjacent uses. The proposed plan satisfies the open space requirements regardless of whether the property were Zoned R–2 or A–1.

(FOF ¶ 18.) We find no error with the Supervisor's determination. The more specific language from the PRD section of the Ordinance would apply over the more general provisions of Table 307.2. As correctly found by the Supervisors, the PRD satisfies this open space requirement.

To the extent there is any ambiguity as to whether Table 307.2 or Section 309(K)(4) would apply, we agree with Developer that Section 309(K)(4) is applicable because: (1) ambiguous restriction language must be interpreted in favor of the Developer and against a more restrictive reading. Section 603.1 of the MPC, added by section 48 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10603.1; and (2) deference must be given to the legislative intent of the governing body that enacted the ordinance. *Borough of Fleetwood v. Zoning Hearing Board of the Borough of Fleetwood,* 538 Pa. 536, 548, 649 A.2d 651, 656 (1994). The Supervisors rejected an interpretation of the Ordinance that would impose the per foot setback and requirement based on the number of units as being onerous and prohibitive of any development but, instead, interpreted the requirement as applying to each building. We find no error in this determination. Accordingly, we find against Appellants as to their frontage and buffer zone arguments.

■■■ Appellants next argue that the Ordinance requires PRDs to have a mixture

of housing types and that the Quadrangle does not meet those criteria. Appellants base this argument on subsection (L) of Section 309 of the Ordinance, which reads in relevant part: "L. *Additional Uses Permitted.* Planned residential development may include the following additional uses: multifamily dwellings, community clubs, churches and related uses...." Appellants contend that, by identifying multi-family dwellings as an "additional use," Section 309 implies that the primary use must be single-family dwellings. In opposition, Developer disagrees that single-family dwellings are required in a PRD. Developer argues that the language of Section 107 of the MPC, 53 P.S. § 10107, was essentially adopted by the Township in their Ordinance's PRD sections and that nothing in this language, or in any part of the Ordinance itself, requires single-family houses. We agree with Developer.

Neither the MPC, nor the Ordinance, requires single-family houses. Section 107, in describing PRDs, does not identify the type of residential housing, but simply uses the phrase "an area of land ... to be developed as a single entity for a number of *dwelling units* ...." 53 P.S. § 10107 (emphasis added). The Ordinance, itself, in the preamble language of Section 309, also does not identify the particular type of housing that is required other than to say that PRDs are designed "to encourage grouping of housing and a mixture of housing types in alternative patterns and in a variety of ways...." (Ordinance § 309.) While this language contemplates multiple types of housing within a PRD, it does not require single-family housing. The language does not say that PRDs "shall" have multiple types of residential dwellings, nor does it say that PRDs must have single-

family housing. Rather, all it says is that part of the goal of PRDs was to "encourage" different housing types. The preamble contains a number of other factors, including "encouraging" the grouping of residential houses. The Quadrangle abides by this factor by grouping the residences together. Perhaps, most notably, the preamble identifies the goal of PRDs to "encourage the flexibility in the design and development of land in order *to promote its most appropriate use.*" (Ordinance § 309 (emphasis added).) In their Decision, the Supervisors found that the proposed PRD was indeed the "most appropriate use" of the Property. In particular, the Supervisors found that:

> [T]he proposed Plan is ideally situated. Since it is intended as a student housing facility, its proximity to the University is natural and logical. Further there are very few single family residences adjacent to the Plan so the impact of this proposal is substantially less than it would be in most other parts of the Township. The University borders the property both on the west and the north. To the east are two single family homes and the balance of the Meyer property from which this site is subdivided. To the south is Kiester Road.

(Decision FOF ¶ 8.) The Supervisors also found that the PRD had sufficient side, front, and rear open space and that, "[i]n addition, there is substantial additional open space between any proposed building and any existing single family residence, and [that] landscaping will further buffer the proposed PRD from adjacent uses." (Decision FOF ¶ 18.) Nothing else in the Ordinance *requires* single-family housing in a PRD.[8] While we see no ambiguity in

8. Subsection K, titled *"Standards for Residential Development Within a Planned Residential Development,"* notes that peripheral areas

"shall only be devoted to single-family dwellings, open space, agriculture or nonresidential uses" and also indicates that "[t]he densi-

the Ordinance's language and, to the extent there is any ambiguity, we again note the deference owed to the legislative intent of the governing body that enacted the Ordinance. *Borough of Fleetwood,* 538 Pa. at 548, 649 A.2d at 656.

■ Appellants next argue that the Quadrangle calls for a maximum density that exceeds the 8 units per acre density mandated by the Comprehensive Plan by 25%. In their Supplemental Brief, filed after this Court granted their motion to have the case argued, Appellants argue that the proposed PRD will be ten times more dense than is allowed by the Ordinance. In making this argument, Appellants rely on Section 309(K)(6) of the Ordinance which provides as follows for determining density within PRDs:

The allowed *density of dwellings* and other uses shall be calculated by dividing the maximum density or minimum single family lot size normally *allowed for the district in which the development is proposed* by *into* the total land area of the proposed planned residential development. This total shall be the maximum number of units which can be constructed within the total buildable area (total area, less required peripheral and interior open space). Buildings containing multifamily units shall have no more than four (4) units/dwellings.

(Ordinance § 309(K)(6) (editing marks in the original) (emphasis added).) Appellants note that the Ordinance defines "dwelling unit" as a building or portion of a building in which one family resides. Appellants also note that, in an A–1 District, a family, when comprised of persons not related by blood, marriage, or adoption, is defined as four or fewer unrelated persons. Implicit within the Appellants' argument is a reliance on Table 307.1 of the Ordinance, which describes "Lot, Yard and Height Requirements." In this table, under A–1, the minimum lot area for "single-family residences" is 2 acres. Appellants argue that, because the rezoning was not effective, the Property continues to be an A–1 district and, therefore, the minimum family lot size for the Property is 2 acres. Appellants further argue that:

When the 42 available acres [are] divided by the 2 acre minimum single family lot size required by the ordinance, 21 units are permitted to be developed within the total building area of the Property under the density provisions of the Ordinance.... As each unit is limited to a family consisting of four unrelated persons, the maximum density for the Property permitted under the Ordinance is 84 persons.

(Supplemental Brief for Appellants at 6.) Appellants argue that the proposed 19 buildings contain 244 dwelling units and that two-thirds of these dwelling units will contain four bedrooms, resulting in the PRD having a proposed occupancy of 800 persons, which exceeds by a factor of ten the limitations set by the Ordinance.

Developer argues that he specifically applied for a modification of the Section 309(K)(6) requirements when the PRD was submitted and that this modification was granted. Developer argues that Appellants offer no authority to support the argument that the density is exceeded by 25%. Developer notes that the Ordinance's restriction on multi-family residential plans allows as many as 12.5 units per

ty of residential units shall generally decrease from the interior of the [PRD]." (Ordinance § 309(K)(1).) This language, however, does not *necessarily* require single-family housing. A PRD could have multi-family housing in the interior of the Property and then have nonresidential uses "such as open space, agriculture or nonresidential uses" on the periphery, as this proposed PRD does.

acre and that Appellants offer no authority requiring less density. Moreover, Developer argues that, while the Comprehensive Plan requires less than 8 units per acre, under *Michaels Development Co. v. Benzinger Township Board of Supervisors,* 50 Pa.Cmwlth. 281, 413 A.2d 743 (1980), comprehensive plans are not ordinances and therefore are not mandatory, but are merely advisory, planning documents. Additionally, Developer argues that Table 307.2, and not 307.1, applies. Table 307.2 is titled "Multifamily Lot, Yard and Height Requirements." This table, 307.2, authorizes up to 12 Units on 1 acre of land or up to 25 units on two acres. Developer argues that, "Since § 309.K of the Ordinance computes density based on the total area less required open space (50%), the density [of the PRD] would be 11.4 units/acre [244 units/21.37 acres (50% of the entire 43 acres)] which is less than the twelve (12) units/acre allowed by the Table." (Developer's Supplemental Brief at 10 (second set of brackets in the original).) Additionally, Developer notes that Appellants' argument relies on Section 309(K)(6), using the word "dwelling unit", when the Ordinance actually uses the more expansive term "dwelling".

■■■■ In addressing Appellants' argument, we first note that Developer did indeed apply for, and did receive, a modification from the 309(K)(6) requirements that limit the PRD to four units per dwelling. We also note that, to the extent Appellants rely on the Comprehensive Plan's requirements over that of the Ordinance, their argument fails.[9] In *Michaels Development,* this Court held that:

> [a] comprehensive plan is not forever binding, nor does it actually regulate land use. It recommends desirable approaches to land utilization and development of a community, not all of which become legally enforceable in a zoning ordinance. In other words, a comprehensive plan is abstract and recommendatory; whereas the zoning ordinance is specific and regulatory. *Morelli v. Borough of St. Marys,* 1 Pa.Cmwlth. 612, 617, 275 A.2d 889, 891–92 (1971).

*Id.* at 747.[10] Developer also correctly notes that Section 309(K)(6) uses the term dwellings (and not dwelling units) to determine density: "[t]he allowed density of *dwellings* and other uses shall be calculated by dividing the maximum density or minimum single family lot size normally allowed for the district in which the development is proposed...." (Ordinance § 309(K)(6) (emphasis added).) Section 202 of the Ordinance defines "dwelling unit" as applying to the building or portion of a building used by a single family. In contrast, Section 202 defines "dwelling" as "a building" which can include several types of dwellings, including both "single-

9. Appellants' initial brief with this Court seems to focus their argument entirely on the PRD's inconsistency with the Comprehensive Plan. Appellants derived this argument from a report prepared by their expert, which identified the inconsistency with the Comprehensive Plan. (Report of Fred Wilder, AICP at 11.)

10. We note that Section 703 of the MPC, 53 P.S. § 10703, directs that PRD provisions "shall be based on and interpreted in relation to the statement of community development objectives of the zoning ordinance and may be related to either the comprehensive plan for the development of the municipality prepared under the provisions of this act or a statement of legislative findings...." As set forth in the facts of this opinion, and as discussed later in this opinion, the Supervisors clearly explained and found that the Quadrangle was consistent with the Comprehensive Plan and, in fact, advanced several components of that Comprehensive Plan. We find no error in the Supervisors' determination.

family" and "multi-family" dwellings. Appellants read this language as providing that a PRD in an A–1 District may only have 8 units per acre; however, the Supervisors and Developer read the language as allowing 8 buildings per acre. The Supervisors and Developer also focus on the language which authorizes PRDs in A–1 Districts and, since PRDs are allowed to have multi-units, interpret the language as allowing multi-units in each of the buildings. The language of the Ordinance is susceptible to either interpretation, both of which seem reasonable. To the extent there is an ambiguity, a zoning ordinance is to be read "in *favor* of the *landowner* and against any implied extension of restrictions on the use of one's property." *Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 484 (Pa.Cmwlth.2006) (emphasis added); *see also, Beers v. Zoning Hearing Board of Towamensing Township*, 933 A.2d 1067 (Pa.Cmwlth.2007) ("Zoning ordinances are to be liberally construed to allow the broadest possible use of land."). Additionally, a board is entitled to deference in interpreting its Ordinance. *Borough of Fleetwood.* In this case, the Supervisors interpreted the Ordinance in favor of allowing the given land use, which is a reasonable construction of the Ordinance's language. We find no error with that decision.

Finally, Appellants argue that the Ordinance requires density to decrease from the interior of the PRD to the exterior, and that this Quadrangle does not comply. Developer counters that the Quadrangle does comply with the requirement that density of residential units decrease from the interior.[11] Developer argues that the Quadrangle plan shows that fourteen of the buildings were located in the interior of the lot and that, moving out from the interior, there are only six additional buildings.[12] Additionally, the buildings fronting the primary road, Kiester Road, are purposefully smaller in size to reduce "massing" on the public road.

In addressing these arguments, we first note that the Ordinance provides that "[t]he density of residential units shall *generally* decrease from the interior of the [PRD]." (Ordinance § 309(K)(1) (emphasis added).) Appellants correctly note that Developer's PRD plan designer acknowledged that the design of the Quadrangle does not decrease in density from the interior.[13] In its Decision, the Supervisors explained how the PRD was consistent with the Comprehensive Plan because "[t]he Township encourages future development and expressly provides that high density developments within the Township should expand outward from the Borough as the hub." (Decision FOF ¶ 19(a).) While requirements established in the

11. Appellants also mention that another requirement of Section 309(K)(1) was not met, specifically that the peripheral areas shall only be devoted to single-family dwellings. (Appellants' Brief at 21.)

12. Developer, in its narrative statement, mentioned twenty-one buildings: nineteen residential buildings, a clubhouse, and a small maintenance building.

13. The following exchange took place before the Supervisors:

Q: Would you agree with me that this plan does not show density which decreases from the interior? In other words, the interior portion which you have as open space should be the most dense area and then it should become less dense as you move out towards the perimeter of the project. That's not the design you have; is that correct?

A: That is correct. . . .

(Conditional Use Hearing Transcript, Mar. 27, 2006 at 58; R.R. at 108a.)

PRD portions of the Ordinance may not be disregarded, the hallmark of PRDs is flexibility.[14] We note that the language of the Ordinance does not require that the density *must* decrease from the interior to the exterior, but states that it should *"generally"* be the case. (Ordinance § 309(K)(1).) Review of the diagrams of the Quadrangle shows that the PRD is denser on the portion of the Quadrangle nearest SRU's campus, on the western side, and becomes less dense on the side away from SRU that borders the community. Less density near the community appears to be the goal of this provision and is accomplished by this design.

The Supervisors also specifically noted that the PRD was designed to create natural buffers with the community through 10.5 acres of open space and a pond on the eastern side of the Property. As recognized by the Supervisors in its Decision, the effect of the Quadrangle is to address a number of issues set forth in the Comprehensive Plan relating to student housing issues arising from SRU's expanding.[15] The Quadrangle effectively operates as a privately owned buffer between SRU and the community. By its design, the Quadrangle transitions SRU's use to the various surrounding uses of the community.

The Supervisors noted how the Quadrangle conformed to the Comprehensive Plan and, more importantly, with the PRD requirements of the Ordinance. From our review, we agree with the trial court's assessment that the Supervisors appropriately applied the law and that Developer met his burden of satisfying the PRD requirements imposed by the Ordinance.

Accordingly, we affirm the trial court's order.

## ORDER

**NOW,** November 29, 2007, the order of the Court of Common Pleas of Butler

---

**14.** We find helpful Ryan's discussion in his treatise on Zoning:

The idea behind PRD zoning is to create a method of approving large developments which overrides traditional zoning controls and permits the introduction of flexibility into the design of larger developments. When a municipality enacts a PRD ordinance and permits PRD's either throughout the municipality, or in designated areas, it has in practical effect amended its comprehensive plan to permit this type of development.

2 Robert S. Ryan, Pennsylvania Zoning Law and Practice, § 12.1.8 (2001 ed. and 2004 supp.).

**15.** The Comprehensive Plan, in discussing "**Public/Institutional Land Uses**" provides the following:

Institutional land can mean a variety of uses. Some require relatively little land use and do not conflict with neighboring uses. Others take vast amounts of space and seriously impact their neighbors. Within the Township, there are a number of these uses which can be projected. These include schools, churches, historic places, governmental facilities, and recreational land.

Generally, existing smaller institutional uses present little, if any, conflict. The potential conflict of churches or schools can easily be handled via land use controls. However, the land use and plans relative to [SRU] are quite another matter.

One recent issue which the Planning Commission has been concerned with is the rapid purchase of land by the Commonwealth for the future development of the University. This concern is born from the loss of both tax base and the hindrance of future taxable private-sector developments through the expansion of a publicly funded institution. A Township/Borough Task Force should meet with the University to learn of information on future development and acquisition plans. Local elected officials should demand a formal role to future development plans to minimize adverse results to their area.

(Comprehensive Plan at 6.)

**1250** 

County in the above-captioned matter is
hereby **AFFIRMED.**