IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andrew Sabatini,                           :
                    Appellant              :
                                           :     No.  668 C.D. 2019
          v.                               :
                                           :     Argued:  February 13, 2020
Zoning Hearing Board of Fayette            :
County, Pennsylvania                       :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION BY
JUDGE McCULLOUGH                                      FILED:  April 24, 2020


          Andrew Sabatini (Landowner) appeals from the April 29, 2019 order of
the Court of Common Pleas of Fayette County (trial court) affirming Resolution 17-
11 (Resolution) of the Zoning Hearing Board of Fayette County (Board), which
denied Landowner's petition requesting the Board to reverse the decision of a
Planning/Zoning Technician (Technician) who issued an enforcement notice (Notice)
against Landowner for keeping agricultural animals on property that is zoned
residential.  For the following reasons, we reverse.


                              **Background**

          Landowner is the owner of property consisting of 1.85 acres, located at
120 Fawn Lane, Acme, Fayette County, Pennsylvania (Property).  (Reproduced
Record (R.R.) at 15a-16a, Notes of Testimony (N.T.) at 10-11.)  The Property is
zoned as an "R-1" district, which is described by the Fayette County Zoning

Ordinance (Ordinance) as a "Moderate Density Residential District." Ordinance, Article II §1000-200. (Board Finding of Fact (F.F.) No. 7.) By letter dated March 16, 2017, the Technician issued the Notice to Landowner stating that the Property was in violation of Article II §1000-203[1] and Article III §1000-301.1 of the Ordinance. (R.R. at 1a; F.F. No. 1.) Specifically, the Notice cited Landowner solely for "[k]eeping agricultural animals on property that is zoned as residential," and required him to remove all "agricultural" animals from the Property. (R.R. at 1a; F.F. Nos. 1-2.) Landowner appealed the Notice and a hearing was held before the Board on May 10, 2017. (R.R. at 5a; F.F. Nos. 3, 5.)

Landowner testified at the hearing. Landowner testified he has resided at the Property for approximately four-and-a-half years and that he has had eighteen pet chickens, including one rooster (chickens, collectively), on the Property for four of those years. (R.R. at 16a, N.T. at 11.) Landowner testified that he never advertised for sale chicken eggs, meat, or feathers, and that he never sold, butchered, or ate any of the chickens. (R.R. at 18a, N.T. at 13.) He explained that the chickens have names and are not confined full-time like a "commercial operation." (R.R. at 20a, N.T. at 15.) Landowner explained that most of the time the chickens were kept in their coop, but when let out to roam free were watched by him or his family members. (R.R. at 19a, N.T. at 14.) Landowner stated that he attempted to keep the chickens off the neighbor's property and put a fence up to keep them from leaving the Property. *Id*.

Theresa Sabatini (Mrs. Sabatini), Landowner's wife, also testified. Mrs. Sabatini explained that the chickens are kept in a coop and are treated as pets. (R.R. at 31a, 34a, N.T. at 26, 29.) Mrs. Sabatini explained that the chickens are fully

---

[1] Article II §1000-203 of the Ordinance prescribes prohibited and permitted uses by district.

confined in the coop and that they cannot get out on their own. (R.R. at 43a, N.T. at 38.) Mrs. Sabatini further explained that a complaint was made by her neighbors, Mr. and Mrs. Sosko (Soskos, collectively), when the chickens were first acquired; however, Landowner was never cited and a fence was subsequently placed between the properties. (R.R. at 38a, N.T. at 33.) Mrs. Sabatini explained that everything was "quiet" for the next three years until the Soskos' dog came onto the Property and killed six chickens. (R.R. at 39a, N.T. at 34.) Mrs. Sabatini also explained that her family does not sell eggs or feathers, eat the chickens, or advertise them for sale. (R.R. at 45a, N.T. at 40.) Landowner and Mrs. Sabatini's children also testified that the chickens were treated as pets. (R.R. at 55a-56a, N.T. at 50-51.)

Steve Stanish (Mr. Stanish), a certified poultry technician for the Pennsylvania Department of Agriculture and the head of the Uniontown Poultry Association, also testified. (R.R. at 58a, N.T. at 53.) Mr. Stanish testified that he believed that the chickens were owned as pets and were not used for a separate purpose. (R.R. at 61a, N.T. at 56.) He explained that he had no concern about chickens being on the Property. *Id.*

Mrs. Sosko also testified. She explained that her property is 100 feet away from Landowner's Property. (R.R. at 68a, N.T. 63.) She stated that she has well water, and is concerned that the chickens defecating on her property will contaminate her water. (R.R. at 69a, N.T. at 64.) She also testified that the chickens go on her porch, run through her front yard, and walk through her car port. *Id.* Mrs. Sosko further explained that the chickens defecate on her front and back porch where her children and grandchildren play. *Id.*

3

Following the hearing, the Board adopted the Resolution which upheld the Notice. (R.R. at 146a.) The Board issued the following, relevant, findings of fact:

6. During said hearing, the testimony was undisputed that the Sabatinis do in fact keep [seventeen] chickens and one rooster on their [P]roperty. It was also undisputed that these chickens and rooster live outside in a cage, not in the Sabatinis' home. Furthermore, the testimony showed that the Sabatinis take the chickens out of the cage daily and allow the chickens to run freely. Occasionally, the chickens go onto the [P]roperty of their neighbors. The rooster crows at various times throughout the day, and not just in the morning.

7. The [P]roperty in question is zoned Residential, R-1. According to . . . Article II §1000-203 [of the Ordinance], there is no provision [that] permit[s] any agricultural uses in an R-1 zoned property.

* * *

11. The Board is compassionate [to] the fact that this particular family genuinely loves their [sic] chickens and have no reason not to believe that this particular family considers each and every one of these chickens as a family pet.

12. These emotional ties to the animals do not change the fact that these animals cannot be kept in a [Residentially] Zoned property. To permit an exception to this family would create a dangerous precedent in that livestock and poultry would essentially be permissible in all property zones, provided the landowner thought them to be pets.

(F.F. Nos. 6-7, 11-12.)

4

The Board also made conclusions of law. The Board concluded that the Ordinance does not specifically define "agricultural uses,"[2] but references poultry within Article III §1000-301.1 of the Ordinance, which describes the technical limitations of agriculture and land use, such as lot size, setback, and compliance with other state law, and thus, the keeping of chickens is an agricultural use because of their mention in that section of the Ordinance. (F.F. Nos. 8-9.) Additionally, the Board concluded that while domesticated animals, such as dogs and cats, are permitted to be kept in an R-1 zone, the number of animals that can be kept is limited, and therefore, the Ordinance does not permit the keeping of 18 chickens. (F.F. No. 13.) Furthermore, the Board stated that under *Buck Hill Falls Company v. Clifford Press*, 791 A.2d 392 (Pa. Super. 2002), where livestock, animals, or poultry are prohibited from being kept on certain property, the keeping of chickens is prohibited, even if they are considered pets. (F.F. No. 14.)

On December 28, 2017, Landowner appealed the Resolution to the trial court. (R.R. at 150a.) On January 11, 2019, the trial court held a hearing. (R.R. at 176a.) The trial court heard arguments from the parties, but did not take additional evidence. Landowner argued that the Ordinance does not specifically prohibit chickens from being kept in a residentially zoned area; that, contrary to the Board's determination, the Ordinance expressly defines the term "agriculture," restricting it to activity that is "commercial" in nature,[3] and because Landowner was not engaged in

---

[2] Contrary to the Board's statement, "agriculture" is defined in Article I §1000-108 of the Ordinance, which is discussed at length below.

[3] The definitional section of the Ordinance, Article I §1000-108, defines "agriculture," in relevant part, as "[t]he commercial production and preparation for market of crops, livestock and livestock products."

5

commercial agriculture, the Ordinance does not apply; and, alternatively, that the chickens are pets, which is a permissible accessory use. (R.R. at 179a-82a, Notes of Argument (N.A.) 5-7.) Contrariwise, the Board argued that chickens are included under the Ordinance's provision outlining technical and dimensional and topographical requirements for an agricultural use, and therefore, are prohibited in a residentially zoned area, and that the chickens are not considered to be pets under the Ordinance.[4] (R.R. at 185a-86a, N.A. 10-11.)

---

[4] Article III §1000-301.1 of the Ordinance provides in full:

A. The Minimum lot size is 80,000 square feet.

B. Any permitted structure, pen, corral or other enclosure for the shelter or confinement of livestock or poultry shall be located not less than 150 feet from any lot line provided, however, that normal farm fencing shall be permitted in accordance with Subsection C.

C. Perimeter fences shall be constructed around all fields and meadows that are used for livestock grazing, feeding and similar activities. The perimeter fence can be located on the property line. The fencing is for the management of keeping animals confined and predators off the property.

D. With the exception of a residential, agricultural, public or semi-public building, no use shall be located within 300 feet of a dwelling or principal building classified as public or semi[-]public building except that the [Board] may allow a use within the required 300 feet upon written consent of the owner of the adjacent dwelling or public/semi-public building.

E. Agricultural operations shall be in accordance with the [Pennsylvania] Municipalities Planning Code [Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§10101 - 11202] statute(s) that governs the production of crops, livestock and livestock operations.

F. The aggregate floor area of all structures on a lot shall not exceed the maximum building coverage. . . .

**(Footnote continued on next page…)**

6

On April 29, 2019, the trial court issued an order denying Landowner's appeal and affirming the Resolution. (R.R. at 219a.) The trial court concluded that evidence existed to support the Board's determination that Landowner was in violation of the Ordinance by keeping the chickens on his residentially zoned property. (Trial court op. at 6.) The trial court concluded that agriculture is not a permitted use in an R-1 area. *Id.* The trial court concluded that its reading of the term "agriculture," as located in the definitions section of the Ordinance at Article I §1000-108, demonstrates that the word "commercial" only applies to the "production and preparation for market of crops," and does not pertain to livestock or livestock products. (Trial court op. at 7.) The trial court also concluded that the keeping of

---

**(continued…)**

G. The maximum length of any building shall be 200 feet when [the] intent is to store farm equipment. The maximum length for buildings and width for buildings used for agricultural purposes shall be 400 feet for each of the length and width.

H. A legally operating farm is permitted to advertise premise-produced products for sale from agricultural activities only. Advertising for businesses or activities located off the property shall not be permitted.

I. The use of property in A-1, R-A, and C-1 for 4-H is an accessory use to the principal use (residential). A lot created and approved after the adoption of this Ordinance is a minimum of 80,000 square feet. A lot legally existing prior to that adoption of Ordinance in the A-1, R-A and C-1 zoning districts shall permit 4-H use as an accessory use. The size of the Shelter for housing shall not exceed 12x12 structure, with a setback of 30' front, 25' side, and 30' rear. Any structure greater than 12x12 shall meet Subsection B.

Ordinance, Article III §1000-301.1.

7

chickens as pets was not a customary and incidental use of the residential Property. (Trial court op. at 8-7.)  Landowner subsequently appealed to this Court.  *Id.*

## Discussion

On appeal,[5] Landowner purports to raise numerous issues.  However, Landowner essentially raises the following two issues: whether keeping chickens as pets meets the definition of agriculture under the Ordinance, and therefore, is not permitted in an R-1 zoned district; and whether the keeping of chickens is a permitted accessory use.[6]  In support of his position, Landowner argues that he was not engaged in commercial agriculture pursuant to Article I §1000-108 of the Ordinance because there is no definition of livestock in the Pennsylvania Municipalities Planning Code or the Ordinance; chickens do not qualify as livestock; and there was no evidence that Landowner was engaged in commercial activity with regard to the chickens. Landowner argues alternatively that the chickens are solely pets, which are a permitted accessory use in the R-1 zone.  Further, Landowner argues that any ambiguity in the Ordinance must be resolved in his favor.  Additionally, Landowner argues that the use of the word "poultry," within the agricultural section of the Ordinance, Article III, §1000-301.1, does not *ipso facto* bring the chickens within the

---

[5] Where, as here, the trial court took no additional evidence, our scope of review is limited to determining whether the Board committed an abuse of discretion or an error of law. *Hamilton Hills Group, LLC v. Hamilton Township Zoning Hearing Board*, 4 A.3d 788, 792 n.6 (Pa. Cmwlth. 2010).  Whether a proposed use falls within a given category of permitted or prohibited uses in a zoning ordinance is a question of law. *Galzerano v. Zoning Hearing Board of Tullytown Borough*, 92 A.3d 891, 894 (Pa. Cmwlth. 2014).

[6] Landowner was not cited with any regard to an accessory use, but argues that the chickens were a permitted accessory use.

8

purview of the agricultural portion of the Ordinance. Finally, Landowner argues that the Board erred in concluding that the chickens were not pets.[7]

The Board argues that the Property is zoned as residential and the Ordinance does not permit agriculture in a residential zone. Further, the Board argues that the reference to "poultry" within Article III §1000-301.1 of the Ordinance brings the chickens within the bounds of the agriculture section of the Ordinance and thus, the Board must treat the chickens as livestock. The Board also argues that while domesticated animals are permitted to be kept in districts zoned as R-1 districts, there are limitations on the number which may be kept, and therefore, 18 chickens are not permitted under the Ordinance. Finally, citing *Buck Hill Falls*, 791 A.2d 392, the Board argues that our sister court has decided that, although chickens may be held out as family pets, they are in fact livestock animals if defined as such.[8]

---

[7] Landowner also argues that the trial court's reliance on *Krupa v. Fayette County Zoning Hearing Board* (Pa. Cmwlth., No. 1111 C.D. 2007, filed January 30, 2008) (unreported) is misplaced. We agree. *Krupa* is readily distinguishable from the instant case. In *Krupa*, the landowner was cited for keeping "farm animals," specifically horses and chickens, on property that was zoned as R-2 residential. However, our disposition in *Krupa* was not concerned with whether the ordinance was violated, but was focused on whether due process was afforded to the landowner. This Court did not analyze whether the keeping of "farm animals" on residential property was prohibited. Nevertheless, *Krupa* is an unreported opinion, and is therefore, not binding under section 414(a) of this Court's Internal Operating Procedures. 210 Pa. Code §69.414(a).

[8] *Buck Hill Falls* is readily distinguishable from the instant matter. In that case, a restrictive covenant prohibited the keeping of "poultry" expressly and our Superior Court concluded that based on common understanding, statutory definitions, and case law, "poultry" and "chicken" are interchangeable. 791 A.2d at 397. Here, however, the Ordinance's definition of "agriculture" does not contain the word "chicken" or "poultry" and even if it did, raising of chickens would still have to be commercial to be considered agriculture under the Ordinance's definition; however, in this case, it is not.

It is undisputed that an R-1 district is defined by the Ordinance as a "Moderate Density Residential District." Ordinance, Article II §1000-200. Article II, §1000-203 of the Ordinance defines uses that are permitted as of right,[9] uses that are permitted by special exception, and uses that are prohibited. Article II §1000-203 (Table 1) of the Ordinance, defines what is and is not permitted under the Ordinance. Our review of Article II §1000-203 (Table 1) of the Ordinance indicates that agriculture is not a permitted use, nor is it allowed by special exception in R-1 zoned districts, thus, we turn to the question of whether Landowner's keeping of the chickens is considered to be an "agricultural" use as defined by the pertinent part of the Ordinance.

It is a principle entrenched in the law that "zoning ordinances are to be liberally construed to allow the broadest possible use of land," *Ligo v. Slippery Rock Township*, 936 A.2d 1236, 1238 (Pa. Cmwlth. 2007), or, in other words, "to give the landowner the benefit of the least restrictive use." *Riverfront Development Group, LLC v. City of Harrisburg Zoning Hearing Board*, 109 A.3d 358, 366 (Pa. Cmwlth. 2015). "[W]e must remember that '[t]he permissive widest use of the land is the rule and not the exception, unless specifically restrained in a valid and reasonable exercise of the police power.'" *Neshannock Township v. Musguire*, 484 A.2d 839, 840 (Pa. Cmwlth. 1984) (quoting *Fidler v. Zoning Board of Adjustment*, 182 A.2d 692, 695 (Pa. 1962)). Indeed, "[t]his Court has held that it is an abuse of discretion for a zoning hearing board to narrow the terms of an ordinance and further restrict the use of a property." *Reihner v. City of Scranton Zoning Hearing Board*, 176 A.3d 396, 400 (Pa. Cmwlth. 2017).

---

[9] "A permitted use refers to a use which is allowed absolutely and unconditionally." *Aldridge v. Jackson Township*, 983 A.2d 247, 257 n.8 (Pa. Cmwlth. 2009) (citations omitted).

In reviewing the plain language of the text of an ordinance, *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015), we are "guided to construe words and phrases in a sensible manner, utilize the rules of grammar and apply their common and approved usage, and give undefined terms their plain, ordinary meaning." *Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006). In interpreting a zoning ordinance, we apply the rules of statutory construction. *Delchester Developers, L.P. v. Zoning Hearing Board of Township of London Grove*, 161 A.3d 1081, 1103 (Pa. Cmwlth. 2017) (citing *Borough of Fleetwood v. Zoning Hearing Board of Borough of Fleetwood*, 649 A.2d 651, 656 (Pa. 1994)). The primary mission of statutory interpretation is to determine legislative intent. Section 1921 of the Statutory Construction Act of 1972, 1 Pa.C.S. §1921. The plain language of a statute generally provides the best indication of legislative intent, and therefore, statutory construction begins with analyzing the text itself. *Kohl*, 108 A.3d at 968 (citing *Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board*, 918 A.2d 171, 176 (Pa. Cmwlth. 2007) (en banc), *aff'd*, 974 A.2d 1144 (Pa. 2009)). To ascertain and provide a natural construction of language and phrases, we may consult dictionaries and can draw upon common sense and basic human experience. *Kohl*, 108 A.3d at 969.[10]

We recognize that "[a board's] interpretation of its own zoning ordinance is entitled to great deference and weight." *Hafner v. Zoning Hearing*

---

[10] In conducting this analysis, this Court is mindful "that the setting in which language is used informs our understanding of the particular language employed," *Kohl*, 108 A.3d at 969, and "that the meaning of words may be indicated or controlled by those words with which they are associated." *Commonwealth ex rel. Fisher v. Philip Morris, Inc.*, 4 A.3d 749, 756 n.9 (Pa. Cmwlth. 2010).

*Board of Allen Township*, 974 A.2d 1204, 1210 (Pa. Cmwlth. 2009). As a general matter, the courts afford the interpretation proffered by a zoning hearing board and/or a zoning officer some degree of deference. *See Kohl*, 108 A.3d at 968-69. However, if that interpretation is inconsistent with the plain language of the ordinance or the meaning of the ordinance is unambiguous, the "interpretation carries little or no weight." *Malt Beverages Distributors*, 918 A.2d at 176. This is because "a zoning board is not a legislative body, and it lacks authority to modify or amend the terms of a zoning ordinance." *Greth Development Group, Inc. v. Zoning Hearing Board of Lower Heidelberg Township*, 918 A.2d 181, 187 (Pa. Cmwlth. 2006).

In Article I §1000-108 of the Ordinance, which deals specifically with definitions, "agriculture" as a land use is defined as follows:

> AGRICULTURE -- **The commercial production and preparation for market of crops, livestock and livestock products**, harvesting and preparation for market or use of agricultural, agronomic, horticultural, silvicultural, and aquacultural crops and commodities. The term includes production practices and procedures or types of crops, livestock, livestock products or commodities produced consistent with practices and procedures that are normally engaged by farmers or are consistent with technological development within the agricultural industry. The term shall not include the raising and care of exotic animals, including, but not limited to lions, tigers[,] and/or bear[s].

Ordinance Article I §1000-108 (emphasis added).

Part one of the definition is the relevant portion for our discussion. Agriculture is defined as "[t]he *commercial production and preparation for market* of crops, livestock[,] and livestock products." *Id.* Principles of English grammar state

12

that commas can be used to separate parallel elements in a series or list.[11]  This principle is illustrated as follows; the judges on this panel are Judge McCullough, Judge Wojcik, and Senior Judge Leadbetter.  The phrase, "the commercial production and preparation for market of," modifies each of the succeeding nouns, "crops, livestock, and livestock products," in the list equally.[12]  *See* WILLIAM STRUNK, JR., E.B. WHITE, THE ELEMENTS OF STYLE 92 (E.B. White, ed., 4th ed. 2000).  The trial court, therefore, erroneously concluded that the word commercial in the definition only applies to the "production and preparation for market of crops."  The placement of the phrase "commercial production and preparation" in the same sentence as livestock and livestock products clearly reveals the intended meaning of agriculture to be, in other words, the commercial production and preparation for market of livestock and livestock products.  In order to fall within the definition of "agriculture," the chickens, even assuming they are "livestock," must be utilized "commercially and for market."

Landowner was not using his Property for agriculture because he was not engaged in the commercial production or preparation of the chickens or chicken-related products.  The Ordinance does not define "commercial;" thus, we turn to Black's Law Dictionary for guidance.  Black's defines "commercial" as

---

[11] *See* THE UNIVERSITY OF CHICAGO PRESS, THE CHICAGO MANUAL OF STYLE 312 (Russell David Harper et al. eds., 16th ed. 2010).

[12] By way of further explanation, the statement in Article I §1000-108  of the Ordinance, "[t]he commercial production and preparation for market of crops, livestock[,] and livestock products" means "the commercial production and preparation for market of crops; the commercial production and preparation for market of livestock; the commercial production and preparation for market of livestock products."  Thus, the use of a comma to create a series allows a writer to avoid unnecessary repetition.

"[m]anufactured for the markets; put up for trade <commercial products> [, o]f, relating to, or involving the ability of a product or business to make a profit <commercial potential>." BLACK'S LAW DICTIONARY (11th ed. 2019). Additionally, Black's defines "commercial activity" as "an activity, such as operating a business, conducted to make a profit." *Id.* Webster defines commercial as "of, in, or relating to commerce." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 456 (Gove ed. 1986). These definitions are in line with the Ordinance's requirement that the commercial activity be done with the goal of placing the product in the "market."

The facts illustrate that the raising of the chickens was not commercial in nature. We can discern no fact indicating any type of commercial activity in regard to the chickens, and the Board did not make any similar finding. Conversely, the Board found that the family considers each and every one of the chickens to be a family pet. (F.F. No. 11.) Similarly, the testimony elicited by Landowner and Mrs. Sabatini demonstrates that chicken eggs, meat, and feathers were never advertised for sale; the chickens were never butchered or consumed; each chicken has a name; and the chickens are not confined full-time like commercial chickens. (R.R. at 18a, 20a, 45a; N.T. at 13, 15, 26, 40.) Moreover, the record contains numerous pictures that show the chickens interacting with Landowner's children, as if they were pets. (R.R. at 106a-08a, 110a, 112a-13a.) The record does not reflect that Landowner was engaged in the buying or selling of chickens or chicken-related products, nor was Landowner engaged in a business to place the chickens on the "market" to make a profit from chickens or chicken-related products. We cannot ignore the plain language of the Ordinance that requires agriculture to be commercial in nature.[13]

---

[13] The Ordinance does not define livestock; however, we conclude that the chickens are livestock. Because livestock is not defined under the Ordinance, we turn to the plain and ordinary

**(Footnote continued on next page…)**

14

Therefore, we conclude that the keeping of the chickens was not commercial in nature, and was not an agricultural use as defined by the Ordinance.

Furthermore, the Board contends that, because Article III §1000-301.1(B) of the Ordinance states that "[a]ny permitted structure, pen, corral or other enclosure for the shelter or confinement of livestock or poultry shall be located not less than 150 feet from any lot line provided, however, that normal farm fencing shall be permitted in accordance with Subsection C," the raising of chickens falls within the definition of agriculture. Although it may be true that under the Ordinance, a structure or other enclosure for the confinement of livestock or poultry must be located at least 150 feet from any lot line, mere reference to poultry in this section does not bring Landowner's activity within the definition of agriculture under the Ordinance. Instead of further defining agriculture as a use, these provisions merely detail the technical requirements and limitations for poultry enclosures. However, as we made clear above, Landowner was not engaged in commercial activity with regard to the chickens. Because we conclude that the keeping of these chickens is not agriculture as defined by the Ordinance, we need not reach Landowner's contention that the keeping of the chickens is a permitted accessory use.

---

**(continued…)**

meaning of the word. Black's Law Dictionary defines livestock as, "[f]arm animals; specif., domestic animals and fowls that (1) are kept for profit or pleasure, (2) can normally be confined within boundaries without seriously impairing their utility, and (3) do not normally intrude on others' land in such a way as to harm the land or growing crops." BLACK'S LAW DICTIONARY (11th ed. 2019). Moreover, Webster defines livestock as "animals of any kind kept or raised for use or pleasure; *esp* : meat and dairy cattle and draft animals. . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1324 (Gove ed. 1986). However, regardless of whether the chickens are considered livestock, our conclusion would not change because as we have established Landowner was not engaged in commercial activity with regard to the chickens.

## Conclusion

In sum, we conclude that Landowner was not engaged in agriculture as defined by the Ordinance, and therefore, did not violate the Ordinance by keeping chickens on his Property that is zoned as an R-1 residential district.

Accordingly, the April 29, 2019 order of the trial court is reversed.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andrew Sabatini,               :
         Appellant      :
                          :   No.  668 C.D. 2019
         v.              :
                          :
Zoning Hearing Board of Fayette  :
County, Pennsylvania         :

## ***ORDER***

AND NOW, this 24ᵗʰ day of April, 2020, the April 29, 2019 order of the Court of Common Pleas of Fayette County is REVERSED.

 

_____
PATRICIA A. McCULLOUGH, Judge